**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| THEODORE J. WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:05CV863 |
| | ) | |
| DUSTIN SPEIGHTS, in his official | ) | |
| capacity, and JEFFERY BRAFFORD, in | ) | |
| both his individual and official | ) | |
| capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION, ORDER, AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the Court on Defendants' Renewed Motion for Summary Judgment (Docket Entry 90), Defendants' Motion to Strike the Affidavit of Tony Frick (Docket Entry 98), and Plaintiff's General Pleading for Adjudication (Docket Entry 101). For the reasons that follow, the Defendants' renewed summary judgment motion should be granted and the other two pending motions will be denied as moot.

### BACKGROUND

This case has taken a long and winding procedural path in large part because its underlying allegations intersected with a number of other civil and criminal cases in state and federal court which arose from Plaintiff's involvement with the criminal justice system in Stanly and Union Counties. The actual claims in the instant case, however, are fairly straight-forward; specifically, Plaintiff's Complaint alleges that:

1) by "illegally stopping, searching, and seizing [Plaintiff]" and "falsely charg[ing] [him] with driving while his license were

[sic] revoked" on June 6, 2005, Defendant Dustin Speights (in his official capacity with the Stanly County Sheriff's Office) and Defendant Jeffery Brafford (in both his individual capacity and his official capacity with the Stanly County Sheriff's Office) violated Plaintiff's "rights protected by the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution" (Docket Entry 1 at 1-2); and

2) Defendant Brafford (in both his individual and official capacities) "order[ed] [the illegal] stop, search, seiz[ure], and . . . fabricated charges in retaliation for [Plaintiff's] filing of civil rights complaints against several county officials of Stanly County in Case No. 1:04-CV-00404 . . . in federal court violat[ing] [Plaintiff's] rights protected by the First Amendment of the United States Constitution" (id.).[1]

The previously-filed case (identified by Plaintiff as the foundation for his instant First Amendment retaliation claim against Defendant Brafford) commenced on May 18, 2004, when the Clerk docketed a complaint dated April 7, 2004, via which Plaintiff sued five Stanly County Commissioners and the then-Sheriff of Stanly County, Tony Frick, under 42 U.S.C. § 1983, for the alleged

---

[1] Plaintiff initially purported to bring these constitutional claims via 42 U.S.C. § 1981 (Docket Entry 1 at 1), but thereafter amended his Complaint to switch the statutory basis for said claims to 42 U.S.C. § 1982 (Docket Entry 6-2). He then sought leave to alter that aspect of his Complaint again, this time to cite 42 U.S.C. § 1985. (Docket Entry 12-2.) During a hearing, the Court (per United States Magistrate Judge Russell A. Eliason) denied that request, but allowed Plaintiff to amend his Complaint to identify the proper statutory vehicle for his above-cited claims, 42 U.S.C. § 1983. (Docket Entry dated Jan. 25, 2006; Docket Entry 14 at 1 (¶ 3).)

"deplorable, inhumane, and unconstitutional conditions imposed upon [him] while incarcerated in the Stanly County Detention Facility . . . as a pretrial detainee . . . since November 17, 2003 . . . ." (<u>Williams v. McIntyre</u>, No. 1:04CV404 (M.D.N.C.), Docket Entry 2 at 4.)[2] Specifically, Plaintiff complained about alleged overcrowding that resulted in a denial of "adequate sleeping quarters," "the ability to exercise," and "sanitary conditions." (<u>Id.</u> at 4-6.)

Further, Plaintiff alleged that, due to overcrowding, "officer supervision ha[d] broken down leaving a very violent atmosphere . . . [such that] in December of 2003 [he] was attacked by two black prisoners in a racially motivated attack . . . [and] obtained some pretty serious bruises and contusions [after which] it took over two hours to be able to obtain help." (<u>Id.</u> at 6.) Finally, Plaintiff asserted that "medical facilities and sick call process ha[d] broken down because of overcrowding . . . [as evidenced by the fact that when he repeatedly] complained of an abcessed [sic] tooth . . . [he was] told that he [wa]s on the backlog for

---

[2] According to an affidavit from Sheriff Frick filed in connection with Plaintiff's jail-conditions suit, Plaintiff remained in pretrial detention until July 12, 2004. (<u>Williams v. McIntyre</u>, No. 1:04CV404 (M.D.N.C.), Docket Entry 27 at 4 (¶ 13).) In a separate action (arising from a complaint dated by Plaintiff as executed on March 25, 2004, and filed in this Court on April 21, 2004), Plaintiff alleged that his arrest on November 17, 2003, occurred as a result of "Albemarle City Police Officer Jamie Pope . . . wantonly and willfully, without probable cause conduct[ing] an illegal stop and search . . . [that] violate[d] [Plaintiff's] rights protected by the Fourth Amendment of the United States Constitution . . . made applicable to the States by the Fourteenth Amendment to the United States Constitution." (<u>Williams v. Pope</u>, No. 1:04CV342 (M.D.N.C.), Docket Entry 2 at 3.) The Court, per now-Chief Judge James A. Beaty, Jr., granted summary judgment against Plaintiff in that case. (<u>Williams v. Pope</u>, No. 1:04CV342 (M.D.N.C.), Docket Entry 73 at 1-2.)

treatment . . . [and therefore] suffer[ed] pain unnecessarily due to lack of dental treatment." (<u>Id.</u> at 7.)[3]

On November 22, 2004, Plaintiff sought leave to amend his foregoing jail-conditions complaint, inter alia, to add Defendant Brafford as a defendant on the ground that Defendant Brafford was "personally responsible for housing [Plaintiff] in the [Stanly County Detention Facility] Holding Cell for a period of thirty days . . . with the willful intent to inflict further unnecessary pain and suffering on [Plaintiff] . . . amount[ing] to cruel and unusual punishment [in] violat[ion] [of] the Eighth Amendment and the due process clause of the Fourteenth Amendment." (<u>Williams v. McIntyre</u>, No. 1:04CV404 (M.D.N.C.), Docket Entry 19 at 4-5.)[4] The Court (per United States Magistrate Judge Russell A. Eliason) denied that motion on February 8, 2005. (<u>Williams v. McIntyre</u>, No. 1:04CV404 (M.D.N.C.), Docket Entry 23 at 1-2.)

On April 11, 2005, in his jail-conditions lawsuit, Plaintiff filed an Affidavit in Opposition to Defendants' Motion for Summary

---

[3] In addition to the above-cited allegations related to overcrowding, Plaintiff claimed the facility's "lighting is inadequate" and he "continuously suffered headaches from reading and writing with this inadequate lighting." (<u>Williams v. McIntyre</u>, No. 1:04CV404 (M.D.N.C.), Docket Entry 1 at 6-7.)

[4] Plaintiff's allegations did not make clear when, in relation to his arrest on November 17, 2003, his 30-day "Holding Cell" placement occurred or why it amounted to cruel and unusual punishment. (<u>See</u> <u>Williams v. McIntyre</u>, No. 1:04CV404 (M.D.N.C.), Docket Entry 19 at 3-6.) An affidavit by former Stanly County Sheriff's Deputy Becky Greene (filed by Plaintiff in connection with his jail-conditions lawsuit) indicates that, in and around December 2003, Plaintiff "stayed in the holding cell and visitation area for approximately 30 days" and implies that said placement imposed hardship in the form of lack of ready access to running water and crowded or noisy sleeping accommodations. (<u>Williams v. McIntyre</u>, No. 1:04CV404 (M.D.N.C.), Docket Entry 30-3 at 2 (¶ 7).)

Judgment in which he appeared to reference the incident from December 2003 (cited in his complaint in said case) during which some of his fellow detainees beat him. (<u>Williams v. McIntyre</u>, No. 1:04CV404 (M.D.N.C.), Docket Entry 30 at 3.) In that document, rather than describing the event in question as racially-motivated and a by-product of overcrowding (as he had in his jail-conditions complaint), Plaintiff stated that "[u]pon information and belief it is [his] knowledge that [Defendant Brafford] solicited these inmates to attack and beat [Plaintiff] in retaliation for [his] persistence in complaining and writing the courts." (<u>Id.</u>)[5]

---

[5] Plaintiff did not identify what "complaining and writing the courts" he had done prior to the beating incident in December 2003. (<u>See</u> <u>Williams v. McIntyre</u>, No. 1:04CV404 (M.D.N.C.), Docket Entry 19 at 3-6.) He did not seek to institute any litigation in this Court regarding his interaction with the criminal justice system in Stanly and Union Counties until March and April 2004, when he drafted complaints against an Albemarle Police Officer over events leading to his arrest on November 17, 2003 (<u>see</u> <u>Williams v. Pope</u>, No. 1:04CV342 (M.D.N.C.), Docket Entry 2 at 4), and against the Stanly County Commissioners and then-Sheriff Frick over conditions in the Stanly County Detention Facility (<u>see</u> <u>Williams v. McIntyre</u>, No. 1:04CV404 (M.D.N.C.), Docket Entry 2 at 8), respectively. A decision from the North Carolina Supreme Court in one of Plaintiff's criminal cases states that, "[d]uring February and March 2004 and while in custody in Stanly County, [Plaintiff] initiated actions <u>in various courts</u> naming an assistant district attorney for Stanly County, the Stanly County Sheriff, and the Stanly County Commissioners for alleged civil rights violations." <u>State v. Williams</u>, 362 N.C. 628, 629, 669 S.E.2d 290, 292 (2008) (emphasis added). Those suits must have been filed in state court because, as noted above, Plaintiff dated the complaint he filed against Sheriff Frick and the Stanly County Commissioners in this Court as executed in April 2004 (<u>see</u> <u>Williams v. McIntyre</u>, No. 1:04CV404 (M.D.N.C.), Docket Entry 2 at 8) and Plaintiff waited until 2006 to file suits in this Court against an assistant district attorney (<u>see</u> <u>Williams v. Brafford</u>, No. 1:06CV234 (M.D.N.C.), Docket Entry 2 (complaint filed on March 13, 2006, and dated as signed by Plaintiff on March 5, 2006, suing Defendant Brafford, another Stanly County Sheriff's Office employee, and two assistant district attorneys in connection with opening of Plaintiff's mail and related prosecution of Plaintiff for witness-intimidation and unlicensed practice of law); <u>Williams v. Vlahos</u>, No. 1:06CV383 (M.D.N.C.), Docket Entry 2 (complaint filed on April 24, 2006, and dated as signed by Plaintiff in April 2006, suing two assistant district attorneys for selective and vindictive prosecution)).

In the same affidavit, Plaintiff also averred "[t]hat on April 19, 2004 [Defendant Brafford] had [Plaintiff] sent to Union County Jail. There was not a judges [sic] order for [Plaintiff] to be taken to the Union County Jail, and [Plaintiff] had never been to Union County, and there was no charge or warrant for [Plaintiff] to be in Union County." (Id.) According to Plaintiff, shortly after his arrival at the Union County Jail, "four officers came into the cell and maced and attacked [him]. [Plaintiff] did nothing to provoke this attack and was beaten badly. [He] was then tied to a restraint chair, and a misdemeanor criminal summons was read and served on [him] . . . ." (Id. at 3-4.)

Plaintiff further asserted that he "was shortly thereafter transferred back to [the Stanly County Detention Facility where he] . . . was denied treatment for a broken right arm and multiple bruises and contusions that [he] had sustained as a result of the attack . . . [despite] personally ask[ing] [Defendant Brafford] to let [Plaintiff] see a nurse or a doctor." (Id. at 4.) Finally, Plaintiff averred that "the misdemeanor criminal summons that was read to [him] while [he] was tied in the restraint chair in Union County . . . [was] superceded by two Felony indictments for felonious assault and habitual felon." (Id.) After noting that "Union and Stanly County are [in] the same prosecutorial district," Plaintiff contended that, via said charges, unidentified officials

were "using their authority in an illegal and unconstitutional way so as to retaliate against [him] for [his] litigation." (Id.)[6]

On April 25, 2005, the defendants in Plaintiff's jail-conditions lawsuit filed an affidavit from Defendant Brafford. (Williams v. McIntyre, No. 1:04CV404 (M.D.N.C.), Docket Entry 33.) In said affidavit, Defendant Brafford:

---

[6] In 2006, Plaintiff filed an action in this Court against Union County Jail officials and Defendant Brafford regarding the foregoing events. (Williams v. Stewart, 1:06CV235 (M.D.N.C.), Docket Entry 2.) The Court (per now-Chief Judge James A. Beaty, Jr., adopting Magistrate Judge Eliason's recommendation) dismissed that case without prejudice to Plaintiff re-filing a complaint in this Court that omitted claims against persons for conduct in Union County (which lies in the Western District of North Carolina). (Williams v. Stewart, 1:06CV235 (M.D.N.C.), Docket Entries 3 and 5.) Plaintiff thereafter brought his claims regarding the events in the Union County Jail in the United States District Court for the Western District of North Carolina, but that court dismissed said action without prejudice on the ground that, in securing permission to proceed without payment of the filing fee, Plaintiff had not disclosed that he previously had filed cases using another name that federal courts had dismissed as meritless. See Williams v. Stewart, No. 3:06CV154-MU-02, 2007 WL 1575271, at *1-2 (W.D.N.C. May 30, 2007) (unpublished). Plaintiff evidently failed to re-institute that suit by paying the required filing fee. See Williams v. Stewart, No. 3:06CV154-MU-02, 2009 WL 3261329, at *1 (W.D.N.C. Oct. 7, 2009) (unpublished) (denying Plaintiff's motion for reconsideration of dismissal). The state criminal case against Plaintiff arising from the events in Union County also ended without any merits-based determination, when the North Carolina Supreme Court upheld the dismissal of said charges because, prior to any trial, the State destroyed (and therefore could not produce to Plaintiff in discovery) a poster witnesses had seen in the local district attorney's office that "'contained two photographs of [Plaintiff]. One photograph was made when [Plaintiff] was processed into the jail on November 17th of 2003, with a caption saying, in quotation, "Before suing the District Attorney's office," closed quotation, and a second photograph that was made when [Plaintiff] was processed back into the Stanly County Jail between April 19th and 20th of 2004, which showed [Plaintiff's] injuries and was captioned, quotation, "After he sued the District Attorney's office[.]"'" State v. Williams, 362 N.C. 628, 631, 669 S.E.2d 290, 293 (2008) (internal ellipses omitted). Said court ruled that the poster "would have been admissible at trial for impeachment purposes during [Plaintiff's] cross-examination of the State's witnesses," was "relevant to [Plaintiff's] theory of [a] conspiracy against him [by Stanly and Union County officials to punish him for filing civil rights complaints]," and "would have tended to prove the partial or complete defense of self-defense . . . because proof of the injuries would have tended to show that [Plaintiff] was not the aggressor." Id., 362 N.C. at 637, 669 S.E.2d at 297.

-7-

1) described certain events surrounding Plaintiff's conduct after being placed in a holding cell upon completion of the booking process on November 17, 2003 (<u>id.</u> at 1-2);[7]

2) averred that, "[o]n or about December 23, 2003, . . . [two] black inmates at the Stanly County [Detention Facility] were charged with assaulting and inflicting [sic] serious injury to [Plaintiff] . . . [and] later received an active sentence upon conviction" (<u>id.</u> at 2);

3) asserted that Defendant Brafford "ha[d] never spoken to [said inmates] or any other inmate in an attempt to solicit an attack, threaten or intimidate [Plaintiff]" (<u>id.</u>);

4) acknowledged that, "[o]n or about April 19, 2004, [Defendant Brafford] personally called . . . the Jail Administrator of the Union County Jail, and requested that Union County Jail house [Plaintiff] for the sole purpose of safe-keeping . . . [after which Plaintiff] was transferred to Union County" (<u>id.</u>);

5) reported that, the next morning, said Union County Jail Administrator "called . . . and insisted that [Defendant Brafford] come get [Plaintiff] . . . [because he] had attacked and assaulted [a Union County] detention officer[]" (<u>id.</u> at 2-3);

6) explained that, after Plaintiff arrived back at the Stanly County Detention Facility on April 20, 2004, Defendant Brafford "walked by the holding cell and [Plaintiff] begin [sic] yelling at [Defendant Brafford] something to the effect that [Defendant

---

[7] The affidavit does not state whether Defendant Brafford played a part in that placement. (<u>Williams v. McIntyre</u>, No. 1:04CV404, Docket Entry 33 at 1-2.)

-8-

Brafford] had sent [Plaintiff] to Union County to get his ass beat," but Plaintiff "never once asked [Defendant Brafford] personally to see a nurse or doctor and [Plaintiff] never stated to [Defendant Brafford] that [Plaintiff's] arm was broken or injured" (id. at 3); and

7) disputed Plaintiff's account of the lighting situation in the Stanly County Detention Facility (id.).

By Order dated December 19, 2006, "for judicial convenience, the Court [per Chief Judge James A. Beaty, Jr.] . . . consolidate[d] th[e] [instant] case with Plaintiff's previously filed [jail-conditions] case [of Williams v. McIntyre, No. 1:04CV404 (M.D.N.C.)], . . . in light of the overlapping contentions and the relationship between the cases." (Docket Entry 65 at 4.) In addition, the Court appointed the same counsel that had begun representing Plaintiff in the jail-conditions case to represent him in the instant case and authorized said counsel to "file an Amended Complaint if necessary to clarify the claims raised and the basis therefore." (Id. at 4.)

On April 19, 2007, Magistrate Judge Eliason held a status conference regarding the consolidated cases. (See Docket Entry 68.) At that time, Plaintiff's counsel was given 90 days to amend the Complaint. (Id. at 22-23, 26.) Before the filing of any such amendment, however, all of the defendants in the consolidated cases moved "to dismiss this action with prejudice as Plaintiff is in violation of the 'three-strikes' provision of 28 U.S.C. § 1915(g)." (Docket Entry 69 at 1.) In this regard, said motion asserted that

"Plaintiff has had at least five actions dismissed as frivolous, malicious or for failure to state a claim – two actions under the name 'Theodore Jerry Williams' and at least three under the name 'Theodore Jerry Bolick.'  Thus, Plaintiff should not have been permitted to proceed in forma pauperis . . . ."  (Id.)  Plaintiff (through counsel) conceded that, in securing pauper status in his jail-conditions case (i.e., <u>Williams v. McIntyre</u>, No. 1:04CV404 (M.D.N.C.)), he had failed to disclose all of the prior dismissals.  (Docket Entry 71 at 2.)  However, Plaintiff pointed out that in the instant case he had not proceeded as a pauper, but instead had paid the required filing fee.  (Id.)

In addition, Plaintiff (through his counsel) "request[ed] an extension of time to file the Amended Complaint [until] thirty days after the Court's decision with regard to Defendants' Motion to Dismiss." (Docket Entry 72 at 1.)  The Court (per Magistrate Judge Eliason) granted that request.  (Docket Entry 73.)  Notwithstanding that Order and before any ruling on said motion to dismiss, Plaintiff filed a pro se request to add claims arising from:

1) the opening in December 2003 by Stanly County Sheriff's Office personnel of a letter Plaintiff mailed to a witness in a case of one of his fellow pretrial detainees and the related state prosecution of Plaintiff (Docket Entry 75 at 3, 4-5);[8]

---

[8] In that criminal case, a jury found Plaintiff guilty "of attempting to intimidate a witness, practicing law without a license, and having the status of an habitual felon," <u>State v. Williams</u>, 186 N.C. App. 233, 233, 650 S.E.2d 607, 607 (2007); however, the North Carolina Court of Appeals reversed those convictions on the grounds that, by writing the letter in question, Plaintiff had
(continued...)

2) Plaintiff's interaction with Union County Jail officials in April 2004 and related assault prosecution (<u>id.</u> at 3-4, 5);[9] and

3) Plaintiff's prosecution on marijuana charges (which – according to Plaintiff – the State ended after two hung-jury mistrials) (<u>id.</u> at 5-6).

The Court (per Magistrate Judge Eliason) denied that motion as:

1) premature (because of the pending motion to dismiss and related order staying the deadline for amendment);

2) procedurally defective (because Plaintiff had to proceed through his counsel); and

3) substantively flawed (because it sought to add claims that fell outside the statute of limitations, that involved different defendants and events, and that arose and already were subject to litigation in another district). (Docket Entry 77 at 1-2.)

Thereafter, the Court (per Chief Judge Beaty, adopting with one modification the recommendation of Magistrate Judge Eliason)

---

[8](...continued)
acted as a "meddlesome busybody, . . . [but his] behavior d[id] not rise to the level of a criminal offense," <u>id.</u>, 186 N.C. App. at 241, 650 S.E.2d at 612. Plaintiff filed a civil action in this Court regarding the opening of the letter in question and his related criminal prosecution (<u>see</u> <u>Williams v. Brafford</u>, No. 1:06CV234 (M.D.N.C.), Docket Entry 2); however, the Court (per Chief Judge Beaty, adopting the recommendation of Magistrate Judge Eliason) dismissed that suit without prejudice because, in securing permission to proceed without payment of the otherwise-applicable filing fee, Plaintiff failed to disclose prior cases he had filed under another name that federal courts had dismissed at initial screening (<u>see</u> <u>Williams v. Brafford</u>, No. 1:06CV234 (M.D.N.C.), Docket Entries 30 and 32). A search of the Court's electronic case filing system revealed that Plaintiff did not re-file that action with payment of the applicable filing fee.

[9] As previously noted (<u>see</u> <u>supra</u>, p. 7 n.6), the North Carolina Supreme Court affirmed the dismissal of that criminal case prior to any trial.

-11-

dismissed Plaintiff's jail-conditions case (i.e., <u>Williams v. McIntyre</u>, No. 1:04CV404 (M.D.N.C.)) without prejudice,[10] but ordered that – because Plaintiff had paid the filing fee and had not proceeded as a pauper in the instant case – it would "remain open . . . as a separate action." (Docket Entry 84 at 3 & n.1; <u>see also</u> Docket Entry 78.) Plaintiff's counsel then moved to withdraw from further representation on the ground "that the attorney client relationship [had become] unworkable . . . ." (Docket Entry 85 at 3.) Plaintiff concurred in that assessment and requested to litigate the instant case without an attorney. (Docket Entry 87 at 2.) The Court (per Chief Judge Beaty) "relieved [Plaintiff's counsel] of any further obligation in this matter[,] . . . allow[ed] Defendants to file a renewed Motion for Summary Judgment[, and permitted Plaintiff to] proceed pro se unless he cho[se] to retain an attorney . . . ." (Docket Entry 88 at 2.)

Defendants thereafter renewed their summary judgment motion, Plaintiff responded, and Defendants replied. (Docket Entries 89, 90, 95-97.) In addition, Defendants moved to strike an affidavit Plaintiff filed with his response brief. (Docket Entry 98.) Plaintiff failed to respond to said motion. (<u>See</u> Docket Entries dated Nov. 7, 2008, to the present.) Finally, Plaintiff filed a General Pleading for Adjudication seeking judicial action on his case to which Defendants responded. (Docket Entries 101 and 102.)

---

[10] Although this dismissal occurred without prejudice, a search of the Court's electronic docketing system revealed that Plaintiff failed to re-file his jail-conditions suit with payment of the applicable filing fee.

DISCUSSION

Summary Judgment Standard

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, the Court "may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Instead, it "must consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from the facts in the non-movant's favor." Matvia v. Bald Head Island Mgt., Inc., 259 F.3d 261, 266 (4th Cir. 2001).

"[T]here is no burden upon 'the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact.' Rather, 'the burden on the moving party may be discharged by "showing" – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'" Carr v. Deeds, 453 F.3d 593, 608 (4th Cir. 2006) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)) (internal emphasis omitted). Conversely, the responding party "may not rest upon mere allegations or denials of his pleading, but 'must come forward with specific facts showing that there is a genuine issue for trial.'" Emmett v. Johnson, 532 F.3d 291, 297 (4th Cir. 2008) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). See also Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 308 (4th Cir. 2006)

-13-

("Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law.").

Official Capacity Claims against Defendants

Plaintiff seeks damages from Defendants in their official capacities as officials of the Stanly County Sheriff's Office. (Docket Entry 1 at 1, 2.) "Such a claim, in effect, is against the governmental entity employing [the defendant-officials]." Nivens v. Gilchrist, 444 F.3d 237, 249 (4th Cir. 2006) (citing Kentucky v. Graham, 473 U.S. 159, 166 (1985)); accord Gray v. Lewis, 51 F.3d 426, 431 (4th Cir. 1995) ("[I]n official capacity suits against local government officers, the real party in interest is ordinarily the local government entity itself." (internal citations and quotation marks omitted)). "[Because] the claims against the officers in their official capacities are claims against the entities for which the officers were acting . . ., it must be shown that the actions of the officers were unconstitutional and were taken pursuant to a custom or policy of the entity." Giancola v. State of W. Va. Dep't of Pub. Safety, 830 F.2d 547, 550 (4th Cir. 1987) (citing Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690-92 (1978)) (emphasis added); accord Gordon v. Kidd, 971 F.2d 1087, 1097 (4th Cir. 1992) ("Liability of local governments and their officials sued in their official capacity under § 1983 . . . arises only when city or county officials themselves, through an act establishing a policy or custom, cause the constitutional violation." (citing Monell, 436 U.S. at 694)).

-14-

Plaintiff's Complaint does not allege that any of the claimed unconstitutional acts of Defendants arose from the policies or customs of the Stanly County Sheriff's Office. (<u>See</u> Docket Entry 1 at 2.) Further, when – via their renewed summary judgment motion – Defendants pointed to a lack of evidence that any Stanly County Sheriff's Office policy or custom played any part in the alleged violations (<u>see</u> Docket Entry 89 at 5-6), Plaintiff failed – in his response brief – to identify any evidence that any of Defendants' challenged acts stemmed from the Stanly County Sheriff's Office's policies or customs. (<u>See</u> Docket Entry 96 at 1-7.)

Under these circumstances, Plaintiff's official capacity claims against Defendants fail as a matter of law. <u>See</u> <u>Gantt v. Whitaker</u>, 57 Fed. Appx. 141, 149 (4th Cir. 2003) ("[A]ssuming that [the county officer-defendant] violated [the plaintiff's] constitutional rights, [his] official capacity claim [against the county officer-defendant] fails because [the plaintiff] has not submitted any evidence that his arrest was the result of an unconstitutional or illegal county policy, custom, ordinance, regulation, or decision." (citing <u>Monell</u>, 436 U.S. at 694)); <u>Munford v. Harrelson</u>, No. 1:04CV17, 2005 WL 1703151, at *4 (M.D.N.C. July 20, 2005) (Osteen, J.) (unpublished) ("Plaintiff has not alleged that Defendant Harrelson was acting pursuant to any policy, law, or custom of the Richmond County Sheriff's Department . . . when he arrested Plaintiff. Therefore, Plaintiff has not alleged enough to hold the sheriff or his office liable in this action . . . ."); <u>State ex rel. Wellington v. Antonelli</u>, No.

1:01CV1088, 2004 WL 716707, at *4 (M.D.N.C. Mar. 29, 2004) (unpublished) (Osteen, J.) ("Plaintiffs' claim against Deputy Caliendo in his official capacity cannot survive summary judgment because Plaintiffs fail to provide any evidence that a custom or policy was the basis of the purported constitutional violation.").[11]

### Individual Capacity Claims against Defendant Brafford

*Unlawful Seizure (prior to Formal Arrest)*

Plaintiff's Complaint alleges that, on June 6, 2005, "[Defendant] Speights acting on the orders of [Defendant] Brafford did illegally stop, search, and seize [Plaintiff] as he was walking across North Second St[reet], entering the courthouse in Albemarle . . . ." (Docket Entry 1 at 2.)[12] "The Supreme Court has recognized three distinct types of police-citizen interactions: (1) arrest, which must be supported by probable cause, see Brown v. Illinois, 422 U.S. 590 (1975); (2) brief investigatory stops, which must be supported by reasonable articulable suspicion, see Terry v. Ohio, 392 U.S. 1 (1968);[13] and (3) brief encounters between police

_____

[11] Nor could Plaintiff's official capacity claims proceed on a theory that Defendants acted as policy-makers. See Blair v. County of Davidson, No. 1:05CV11, 2006 WL 1367420, at *12 (M.D.N.C. May 10, 2006) (unpublished) (Beaty, J.) (recognizing that "North Carolina law establishes that the Sheriff is the sole law-enforcement policymaker" within North Carolina counties).

[12] Although the Complaint refers to a "search," as well as a "stop" and "seizure," Plaintiff's brief responding to Defendants' renewed summary judgment motion (Docket Entry 96), his earlier affidavit (Docket Entry 31), and the excerpts of his deposition testimony before the Court (Docket Entry 25-2) all fail to identify any "search" that occurred prior to Plaintiff's formal arrest.

[13] A "stop" of this sort constitutes a "seizure," but, because it involves a more limited intrusion (both in time and invasiveness) than an "arrest," a "stop" requires less justification than an "arrest." Terry, 392 U.S. at 16-22.

and citizens, which require no objective justification, <u>see</u> <u>Florida</u>
<u>v. Bostick</u>, 501 U.S. 429 (1991)." <u>United States v. Weaver</u>, 282
F.3d 302, 309 (4th Cir. 2002) (parallel citations omitted).

In moving for summary judgment, Defendants have admitted that,
based on information provided by Defendant Brafford, Defendant
Speights had an encounter with Plaintiff in and around the North
Second Street cross-walk near the county courthouse in Albemarle;
however, Defendants deny that the record would permit a finding
that said encounter violated the Constitution because the evidence
establishes as a matter of law that Plaintiff consented to his
interaction with Defendant Speights and, alternatively, that
reasonable suspicion of criminal activity existed to support a
brief investigatory detention. (Docket Entry 89 at 1-5, 7, 9-12.)

Evidence Related to Unlawful Seizure Claim

According to a sworn statement from Defendant Brafford:

1) "[p]rior to June 6, 2005 [Defendant Brafford] was familiar
with [Plaintiff]" (Docket Entry 26 at 1 (¶ 5));

2) "on the morning of June 6, 2005 [Defendant Brafford]
obtained and reviewed [Plaintiff's jail records in order to respond
to Plaintiff's criminal defense attorney's] subpoen[a] [for such]
records . . . [and] discovered that the booking officer failed to
obtain information about [Plaintiff's] current address and drivers'
license" (<u>id.</u> at 2 (¶ 9));

3) "to remedy these deficiencies, [Defendant Brafford]
contacted the Communications Center in the Sheriff's Office and

-17-

. . . was informed . . . that [Plaintiff's] license was suspended"
(id. at 2 (¶¶ 9-10));[14]

4) later on June 6, 2005, while in a vehicle with Stanly
County Sheriff's Office Sergeant Brandon King attending to a
citizen report about a stolen vehicle, Defendant Brafford "saw a
Toyota pickup truck . . . heading south on Second Street [near the
county courthouse in Albemarle] . . . [and,] [i]n the short time
that [he] could see into the truck as it drove by, [Defendant
Brafford] believed that [he] saw [Plaintiff] sitting in the
driver's seat operating the vehicle," a fact which he communicated
to Sergeant King (id. at 2 (¶¶ 11-13); see also id. at 1 (¶ 4));[15]

5) Defendant Brafford saw Defendant Speights's vehicle
traveling on a course toward the same area where the Toyota pickup
truck appeared headed and "asked Sergeant King to inform
[Defendant] Speights of [Defendant Brafford's] suspicion that
[Plaintiff] was driving a Toyota pickup truck while his license was
suspended . . . [and] to ask [Defendant] Speights to investigate
the situation," which Sergeant King did (id. at 3 (¶¶ 14-19).[16]

---

[14] Plaintiff challenges Defendant Brafford's account of the circumstances
that led him to check the status of Plaintiff's driver's license. (Docket Entry
96 at 1-4.) However, Plaintiff does not dispute that, shortly before this
incident, Defendant Brafford had obtained information that the Division of Motor
Vehicles had suspended Plaintiff's license. (See id.)

[15] Sergeant King has given a matching sworn account of these events.
(Docket Entry 27 at 1-2 (¶¶ 4-7).)

[16] By affidavit, Sergeant King has confirmed Defendant Brafford's report
regarding these matters. (Docket Entry 26 at 2 (¶¶ 8-12).)

Defendant Speights has averred that:

1) "[p]rior to June 6, 2005, [Defendant Speights] was familiar with [Plaintiff]" (Docket Entry 28 at 1 (¶ 5));

2) "[w]hile traveling north on Second Street, near [the county courthouse in Albemarle], [Defendant Speights] was contacted by Sergeant Brandon King . . . [who reported] that [Defendant] Brafford believed [Plaintiff] was driving a Toyota pick up truck while his license was suspended . . . [and] that if [Defendant Speights] turned right on to Main Street, [he] should encounter the Toyota truck" (id. at 2 (¶¶ 7-8); see also id. at 1 (¶ 4));

3) "at the intersection of Main Street and Second Street . . . [Defendant Speights] observed the Toyota pick up truck described to [him] by Sergeant King pass [by]" (id. at 2 (¶ 9));

4) after turning his vehicle around, Defendant Speights "observed the [suspect] vehicle . . . parked . . . across from the Stanly County Courthouse[,] . . . stopped behind [said] vehicle . . . and activated [his] blue light" (id. at 2 (¶¶ 10-11));

5) "[a]s [Defendant Speights] exited [his] vehicle, [he] observed [Plaintiff] crossing Second Street in the cross walk[,] . . . approached [Plaintiff] while he was crossing the street and asked to see his driver's license, which [Plaintiff] voluntarily provided" (id. at 2 (¶ 12));

6) "[i]n order to stay out of the flow of traffic, [Defendant Speights] moved from the cross walk to the rear of [his] vehicle . . . [and] asked [Plaintiff] to join [him]," which Plaintiff did, whereupon, at Defendant Speights's request, "Officer [Charles]

Hugel crossed the street from the courthouse to [assist Defendant Speights]" (id. at 2 (¶¶ 12-13));

7) with Plaintiff's driver's license in hand, Defendant Speights "contacted the Communications Center of the Stanly County Sheriff's Office via [his] Nextel radio to determine the status of [Plaintiff's] license . . . [and] was informed . . . that [it] was suspended and that a Pick Up Order had been issued by the Division of Motor Vehicles for [said] license" (id. at 2-3 (¶ 14));[17]

8) Defendant Speights thereafter "informed [Plaintiff] that he was under arrest for driving while his license was suspended" and took him into custody (id. at 3 (¶ 17));

9) "[a]t no point in time prior to [Plaintiff's] arrest did [Defendant Speights] inform [Plaintiff] that he was required to remain in the area[,] . . . make physical contact with [Plaintiff] . . . [or] verbally or physically threaten [Plaintiff]" (id. at 3 (¶ 18)); and

10) "[d]uring [Defendant Speights's] encounter with [Plaintiff,] [Defendant Speights] removed [his] Tazer from the rear of [his] vehicle and placed it behind [his] back in the waistband of [his] pants . . . [because Defendant Speights] was aware of [Plaintiff's] criminal history . . . [and felt the need to take] this action for [his] own safety"; however, "at no point in time

_____

[17] In his deposition, Plaintiff suggested that the Division of Motor Vehicles wrongly had classified his driver's license as suspended (Docket Entry 25-2 at 7); however, Plaintiff offered no basis to doubt Defendant Speights's testimony that the Stanly County Communications Center advised him that records of the Division of Motor Vehicles reflected the suspension of Plaintiff's license and the issuance of a Pick Up Order (Docket Entry 25-2 at 20-21).

did [Defendant Speights] threaten [Plaintiff] with [said] Tazer, nor did [Defendant Speights] ever point [said] Tazer at [Plaintiff]" (id. at 3 (¶ 19)).

During his deposition, Plaintiff testified as follows:

1) on June 6, 2005, 18-year-old Roy Blizzard drove Becky Greene's truck from Albemarle to High Point, picked up Plaintiff, and drove Plaintiff to the county courthouse in Albemarle (Docket Entry 25-2 at 11-13; see also Docket Entry 31-7 at 1 (¶ 2));[18]

2) Plaintiff "g[o]t out of the passenger side of [the truck], walk[ed] into the restaurant directly in front of the courthouse[,]

_____

[18] Blizzard similarly has sworn "[t]hat on June 6th, 2005 [he] drove [Plaintiff] to the Stanly County courthouse for [Greene, his stepmother,] in her 1994 Toyota pick-up truck." (Docket Entry 31-8 at 1 (¶ 1).) In and around that time, Plaintiff, Greene, and Blizzard jointly participated in a group called "Citizens for Justice." (Docket Entry 25-2 at 24; Docket Entry 31-7 at 1 (¶ 3).) According to an affidavit by Greene (dated as signed on April 6, 2005) submitted by Plaintiff in his jail-conditions case, Greene served as a Stanly County Sheriff's Deputy "from April 2002 through July 18, 2004." (Williams v. McIntyre, No. 1:04CV404 (M.D.N.C.), Docket Entry 30-3 at 1 (¶ 4).) Greene averred that she had known Sheriff Frick since he was a high school student and that she obtained her job as a Deputy after she "served on the political election campaigns that helped elect [him] as Sheriff of Stanly County." (Id. at 1 (¶¶ 3-4.)  Said affidavit further asserts that, during her service as a Deputy (which included work in the Stanly County Detention Facility), Greene told Sheriff Frick that "inmates wasn't [sic] getting any type of exercise or proper water facilities, and [he] told [her] to mind [her] own business, 'that was his g_____ jail and he would f_____ run it the f_____ way he f_____ wanted to.'" (Id. at 3 (¶ 7) (blank underscoring in original).) Greene's affidavit also reported that Plaintiff "was highly disliked by many [Stanly County Sheriff's Office personnel] . . . [and that] she "even heard [Sheriff Frick] one day in May of 2004 state that he would hire a hit-man to kill [Plaintiff]." (Id. at 4-5 (¶ 12).) In an affidavit captioned for filing in a number of Plaintiff's state criminal cases (dated as signed on February 6, 2008) – which Plaintiff submitted with his brief opposing Defendants' instant renewed summary judgment motion – Sheriff Frick described Greene as "an outstanding citizen who has dedicated her life to serving her community . . . ." (Docket Entry 96-4 at 4 (¶ 16).)  Sheriff Frick's affidavit, however, did not comment on the veracity of Greene's allegations that he previously profanely professed indifference to her reports regarding purported inadequacies in the Stanly County Detention Facility and/or that he expressed an intent to contract for Plaintiff's murder. (See id. at 2-5.)

. . . talk[ed] to . . . Blizzard[,] . . . got [himself] a soda, [and] left out . . . crossing the street" (Docket Entry 25-2 at 4);

3) as Plaintiff "cross[ed] the street," Defendant Speights stopped his vehicle "in front of the courthouse[,] . . . g[ot] out, and . . . ask[ed] [Plaintiff] for [his] ID . . . [while Plaintiff stood] in the middle of the street" (id.);[19]

4) Plaintiff "lifted [his] sunglasses, and . . . said, 'You know me, Mr. Speights.  What do you want my ID for?'" (id.);[20]

5) after this colloquy, Defendant Speights "asked [Plaintiff] to step . . . out of the road," which he did, although he "refused to get too close to [Defendant Speights's vehicle]" (id. at 18);

6) Defendant Speights thereafter "said, 'Theodore, just give me your ID[,]'" whereupon Plaintiff "said, 'What do you want my ID for, Mr. Speights?  Tell me what you want it for.'" (id. at 4-5);[21]

---

[19] According to Plaintiff, Defendant Speights's exact words at that time were either:  "'Let me see your license'" (Docket Entry 25-2 at 16) or "'Let me see your ID'" (id. at 23).  Plaintiff also testified that, as Defendant Speights made that statement, "[h]e was standing there with his hand on [his] gun." (Id.)

[20] At another point in his deposition, Plaintiff added that, during this part of the exchange, he also asked Defendant Speights:  "'What do you want me for?'" (Docket Entry 25-2 at 16.)

[21] Later in his testimony, Plaintiff described this part of the colloquy as follows:  "[Defendant Speights responded] 'I need to see your ID' . . . [and Plaintiff replied] 'No, I'm not going to give you nothing.  Tell me your probable cause.'" (Docket Entry 25-2 at 16.)  At the time, Plaintiff "was very irate about the situation" (id.) and "when [he] started saying, 'What's your probable cause?' [Defendant Speights] clearly unsnapped [his] gun." (Id. at 23.) However, Defendant Speights never "un-holster[ed] his pistol." (Id. at 22.)  Nor did Defendant Speights make any verbal threats. (Id. at 24.)

7) in response, Defendant Speights "said, 'Theodore, don't give me a hard time.  Please just give me your ID.'" (<u>id.</u> at 5);[22]

8) Defendant Speights then "call[ed] for assistance, and [Officer Hugel] came running out of the front of the courthouse,"[23] whereupon Plaintiff "reached in [his] billfold, and . . . handed [Defendant Speights] the driver's license" (<u>id.</u> at 5);[24]

9) at that point, Defendant Speights "backed up for just a moment, . . . talk[ed] on a cell phone . . . [and] reach[ed] in the back [of his vehicle]" (<u>id.</u> at 17),[25] while Officer Hugel "came up and placed his hand on [Plaintiff's] arm and kind of just held [Plaintiff] at bay" (<u>id.</u> at 18);

10) Officer Hugel "was trying to talk to [Plaintiff] and [was] saying, 'Calm down, Theodore.  If you ain't done nothing wrong, go ahead, just cooperate with the man.'  So [Plaintiff] said, 'I will, but this is bull crap.'" (<u>id.</u> at 5);[26] and

---

[22] In recapping this interaction elsewhere in the deposition, Plaintiff reported Defendant Speights's final words as "'Give me your license.'"  (Docket Entry 25-2 at 16-17.)

[23] Although Plaintiff initially referenced "officers" (plural) running from the courthouse, he subsequently identified only Officer Hugel (misspelled as "Jugler" in Plaintiff's deposition transcript) as having "come[] running out the front door of the courthouse, coming to assist [Defendant] Speights."  (Docket Entry 25-2 at 18; <u>see also</u> <u>id.</u> at 17, 21; Docket Entry 89 at 3 n.5.)

[24] According to Plaintiff, "[w]hen [he] s[aw] [Officer Hugel] running out of the courthouse . . . [Plaintiff] guess[ed] [he] was fixing to get beat up." (Docket Entry 25-2 at 17.)

[25] "[Plaintiff] thought [Defendant Speights] was reaching for a Tazer gun." (Docket Entry 25-2 at 17.)

[26] In his deposition, Plaintiff allowed that, rather than "bull crap," he "might have said bullshit."  (Docket Entry 25-2 at 5.)

11) immediately thereafter, "[Defendant] Speights t[old] [Plaintiff] to put [his] hands behind [his] back. [Plaintiff] said, 'What am I being arrested for?' [Defendant Speights] said, 'Driving while your license is suspended.' [Plaintiff] said, 'Mr. Speights, I'm not driving. I'm walking across a public street . . . trying to make it to court before my $150,000 bond is revoked.' [Plaintiff] said, 'Is that you guys' intention, to get my bond revoked?' [Defendant Speights] sa[id], 'I don't know. I'm just doing what I was told to do, Theodore.'" (id. at 5-6).[27]

## Analysis of Unlawful Seizure Claim

A seizure occurs when the circumstances objectively reflect that a law enforcement officer has restricted the freedom of an individual to depart via physical force or show of authority to which the individual submits. See United States v. Smith, 396 F.3d 579, 586 n.5 (4th Cir. 2005) ("The Supreme Court has held that a suspect is not seized within the meaning of the Fourth Amendment until officers apply physical force or the suspect submits to a show of authority." (citing California v. Hodari D., 499 U.S. 621, 626 (1991))).[28] Defendant Speights did not seize Plaintiff by

---

[27] Upon arresting Plaintiff, Defendant Speights frisked him and law enforcement officials carried out a further search of his person at the Stanly County Detention Facility. (Docket Entry 25-2 at 23.)

[28] Although Plaintiff makes reference to the Fourth, Fifth, and Fourteenth Amendments in connection with this aspect of his Complaint (Docket Entry 1 at 2), the Fourth Amendment (as made applicable to the States by the Fourteenth Amendment) governs Plaintiff's instant claims. See generally Graham v. Connor, 490 U.S. 386, 394 (1989) (ruling in excessive force context that, "[b]ecause the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment,
(continued...)

approaching him in the street and asking to see his driver's license. See Bostick, 501 U.S. at 437 ("[N]o seizure occurs when police ask questions of an individual [or] ask to examine the individual's identification . . . so long as the officers do not convey a message that compliance with their requests is required."); United States v. Farrior, 535 F.3d 210, 218 (4th Cir. 2008) ("The Supreme Court has made it very clear that a 'seizure does not occur simply because a police officer approaches an individual and asks a few questions.'" (quoting Bostick, 501 U.S. at 434)).[29]   Nor, according to his own testimony, did Plaintiff submit to any show of authority by Defendant Speights; rather, Plaintiff vociferously refused to provide his driver's license, even though Defendant Speights had his hand on his firearm and unsnapped the holster strap while asking for it. (See Docket Entry 25-2 at 4-5, 16, 23.)   Instead, in Plaintiff's account, Officer Hugel's emergence from the courthouse caused Plaintiff to tender his license to Defendant Speights. (Docket Entry 25-2 at 5, 18.)

However, Plaintiff also has testified that, after he gave his driver's license to Defendant Speights and while Defendant Speights talked on a cellular telephone, Officer Hugel "placed his hand on [Plaintiff's] arm and kind of just held [Plaintiff] at bay" (id. at 18). Such an application of physical restraint – which, at this

_____

[28](...continued)
not the more generalized notion of 'substantive due process,' [arising from the Fifth or Fourteenth Amendments] must be the guide for analyzing these claims").

[29] "While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." Weaver, 282 F.3d at 309-10.

stage of the proceedings, the Court must accept as having occurred
– constitutes a seizure.  See United States v. Holloway, 367 Fed.
Appx. 431, 433 (4th Cir. 2010) (implying that, absent credible
testimony from officer that he "grabbed [citizen's] arm . . . to
protect [citizen] from moving vehicles" in roadway into which
citizen had stepped during encounter (and not to restrain citizen),
officer's grabbing of citizen's arm would have qualified as
seizure); Slusher v. Carson, 540 F.3d 449, 454 (6th Cir. 2008)
("[The plaintiff's] liberty was restrained when Deputy Carson
grabbed [the plaintiff's] right hand as she certainly was not at
liberty to ignore the police presence and go about her business."
(internal quotation marks and brackets omitted)); Gainor v. Douglas
Cnty., Ga., 59 F. Supp. 2d 1259, 1271 (N.D. Ga. 1998) ("[P]laintiff
was seized when Officer Bearden grabbed plaintiff by the arm.").

Accordingly, in seeking summary judgment on Plaintiff's claim
that – prior to his formal arrest – he suffered an unconstitutional
seizure, Defendants may not rely on the allegedly consensual nature
of the interaction between Plaintiff and Defendant Speights, at
least as to the period after Officer Hugel physically restrained
Plaintiff.[30]  The question therefore arises as to whether reasonable
suspicion existed to permit this brief detention of Plaintiff for
investigatory purposes.  See United States v. Moore, 817 F.2d 1105,

---

[30] Because this restraint rendered the continued interaction between
Plaintiff and Defendant Speights non-consensual, for purposes of addressing
Defendants' renewed summary judgment motion, the Court need not decide whether
Officer Hugel's arrival (which purportedly precipitated Plaintiff's provision of
his license) or Defendant Speights's simultaneous reaching into the back of his
vehicle amounted to a show of authority sufficient to effect a seizure.

1108 (4th Cir. 1987) ("A brief but complete restriction of liberty is valid under <u>Terry</u>.").  "[T]he reasonable suspicion standard is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence. However, the <u>Terry</u> reasonable suspicion standard does require a <u>minimal level of objective justification</u> for the police action." <u>United States v. Foreman</u>, 369 F.3d 776, 781 (2004) (internal citation and quotation marks omitted) (emphasis added).[31]

In this case, Defendant Speights received information that Defendant Brafford believed Plaintiff was driving a truck with a suspended license.  (Docket Entry 28 at 2 (¶¶ 7-8).)  Defendant Brafford's underlying belief arose from his personal observation and recent receipt of a report about Plaintiff's driver's license records.  (Docket Entry 26 at 2 (¶¶ 11-19).)  Defendant Speights promptly saw the truck – first traveling in the area that Defendant Brafford (through Sergeant King) had indicated and then parked across from the courthouse – and thereafter observed Plaintiff

---

[31] In making this assessment, the Court considers the collective knowledge of all officers involved, not just the one who made the seizure.  <u>See</u> <u>United States v. Hensley</u>, 469 U.S. 221, 232 (1985) ("[I]f a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information." (internal citations omitted)); <u>United States v. Smith</u>, 386 Fed. Appx. 399, 402 (4th Cir. 2010) ("The basis for an officer's reasonable suspicion 'can rest upon the collective knowledge of the police, rather than solely on that of the officer who actually makes the stop.'" (quoting <u>United States v. Pitt</u>, 382 F.2d 322, 324 (4th Cir. 1967)) (internal brackets omitted)); <u>United States v. Rochelle</u>, No. 1:05CR112, 2009 WL 382745, at *5 (M.D.N.C. Feb. 12, 2009) (unpublished) (Schroeder, J.) ("[T]he court can look to the collective facts constituting reasonable suspicion to conduct a warrantless stop or search.").

crossing the street toward the courthouse. (Docket Entry 28 at 2
(¶¶ 9-11.) At that point, the collective knowledge of Defendants
provided at least a "minimal level of objective justification,"
<u>Foreman</u>, 369 F.3d at 781, to suspect that Plaintiff had just driven
a vehicle without a license, a misdemeanor under North Carolina
law, <u>see</u> N.C. Gen. Stat. § 20-28(a).[32]

---

[32] Plaintiff contends that Defendant Brafford lied about seeing Plaintiff
driving. (Docket Entry 96 at 1-4.) In making this claim, Plaintiff focuses on
three things: 1) the alleged inconsistency between the testimony Defendant
Brafford gave (at one of Plaintiff's criminal trials) about Defendant Brafford's
job duties and Defendant Brafford's sworn account of the circumstances that led
him to observe the vehicle in which Plaintiff arrived at the courthouse (<u>id.</u> at
1-2); 2) statements in Sheriff Frick's affidavit that purportedly undermine
Defendant Brafford's credibility (<u>id.</u> at 2); and 3) evidence that Plaintiff was
not, in fact, driving on June 6, 2005 (<u>id.</u> at 2-3 (citing his own affidavit and
affidavits by Greene and Blizzard)). As to the first of these issues, Defendant
Brafford's prior testimony that his "duties were the court, civil, and the
detention facility" (Docket Entry 96-2 at 5) does not render incredible Defendant
Brafford's averment that, on the morning of June 6, 2005, he was assisting
Sergeant King in addressing a citizen's report regarding a stolen vehicle because
Sergeant King's partner was unavailable (Docket Entry 26 at 2 (¶¶ 11-12)).
Second, Sheriff Frick's affidavit reflects no personal knowledge that Defendant
Brafford ever made a false statement of any sort, much less that Defendant
Brafford lied about what he witnessed on June 6, 2005; instead, in its negative
comments about Defendant Brafford, Sheriff Frick's affidavit consists of
unsupported, generalized, conclusory assertions. (<u>See</u> Docket Entry 96-4.)
Finally, Plaintiff's submission of evidence that Blizzard drove Plaintiff to the
courthouse on June 6, 2005, does not create a material question of fact as to
whether Defendant Brafford lied when he averred that he "believed that [he] saw
[Plaintiff] sitting in the drivers [sic] seat operating the vehicle." (Docket
Entry 26 at 2 (¶ 13).) At most, Plaintiff's evidence in this regard (if true)
would establish that Defendant Brafford's belief about what he observed was
mistaken; Plaintiff must come forward with something more to justify an inference
that Defendant Brafford misrepresented what he believed he saw (and thereby to
raise a genuine dispute sufficient to avoid summary judgment). <u>See</u> <u>Springer v.
Durflinger</u>, 518 F.3d 479, 484 (7th Cir. 2008) ("The [plaintiffs'] argument in
opposition to summary judgment [on their § 1983 claim] boils down to an
allegation that defense witnesses are lying . . . . [W]hen challenges to
witness' credibility are <u>all</u> that a plaintiff relies on, and he has shown no
independent facts – no proof – to support his claims, summary judgment in favor
of the defendant is proper." (emphasis in original)); <u>Bodett v. CoxCom, Inc.</u>, 366
F.3d 736, 740 n.3 (9th Cir. 2004) ("A party cannot create a dispute of fact by
simply questioning the credibility of a witness."); <u>Johnson v. Goldsmith</u>, No. 96-
(continued...)

A further question, however, remains because, although "Terry stops are permitted to investigate previous felonies, . . . the Supreme Court has never decided whether Terry stops are justified by a need to investigate previous [i.e., completed, not in-progress] misdemeanors . . . ." United States v. Hughes, 517 F.3d 1013, 1017 (8th Cir. 2008) (citing United States v. Hensley, 469 U.S. 221, 229 (1985)).  Before the Eighth Circuit's ruling in Hughes, "[t]hree other circuit courts ha[d] addressed this issue.

---

[32](...continued)
2027, 111 F.3d 133 (table decision without opinion), 1997 WL 174097, at *3 (7th Cir. Apr. 7, 1997) (unpublished) ("[The plaintiff] attempts to counter [the officer's] undisputed testimony as to the presence of the 'No Parking' sign by accusing [the officer] of having placed the portable sign on the street to 'manufacture' probable cause [to cite the plaintiff for illegal parking]. . . . [The plaintiff's] bare allegation is insufficient to forestall summary judgment [on his § 1983 claim].");  Moody v. St. Charles Cnty., 23 F.3d 1410, 1411-12 (8th Cir. 1994) ("[The plaintiff] alleges that [the charging officer] lied in his affidavit that served as the basis for both arrest warrants [charging the plaintiff with selling drugs]. . . .  [S]uch actions on the part of a police officer would violate clearly established constitutional norms, and therefore may serve as the basis for a section 1983 action.  However, . . . to withstand the motion for summary judgment, [the plaintiff] must substantiate his allegations . . . .  Without some evidence other than [the plaintiff's] own naked assertions that he did not sell drugs, summary judgment was appropriately granted to [the charging officer].");  United States v. Miscellaneous Jewelry, 667 F. Supp. 232, 233 n.2 (D. Md. 1987) ("[C]laimant seemed to indirectly question the accuracy and reliability of the deposition testimony of Officer Harwood relied on in part by the Government regarding the issue of probable cause.  An unspecified hope of undermining the credibility of a deponent does not suffice to avert summary judgment unless other evidence about the deponents' credibility raises a genuine issue of material fact.");  cf. Chancellor v. City of Detroit, 454 F. Supp. 2d 645, 648-49 (E.D. Mich. 2006) (denying Defendant officers' summary judgment motion in § 1983 case because evidence raised "genuine issue of material fact as to where the gun allegedly found in Plaintiff's car was actually found" and "support[ed] Plaintiff's position that Defendant officers lied about the gun, and planted it in order to fabricate probable cause to arrest Plaintiff," where one Defendant officer "admitted that he had lied on his police report," where Plaintiff testified that, when he denied possession of the gun at the time of his arrest, another Defendant officer "responded that he was going to say that it was Plaintiff's gun and if Plaintiff didn't shut up, [Defendant officer] would also plant some dope on Plaintiff," and where "grand jury found sufficient evidence to indict Defendant officers for conspiracy to violate civil rights, by finding that [they] had lied in their reports about Plaintiff's arrest").

The Sixth Circuit [had] state[d] that police may not make a stop on reasonable suspicion of a 'mere completed misdemeanor.' The Ninth and Tenth Circuits [had] refuse[d] a per se standard, and following Hensley, [had] balance[d] the individual's interest with the governmental interest on a case-by-case basis." Id. (quoting and/or citing Gaddis v. Redford Twp., 364 F.3d 763, 771 n.6 (6th Cir. 2004), United States v. Grigg, 498 F.3d 1070, 1081 (9th Cir. 2007), and United States v. Moran, 503 F.3d 1135, 1141 (10th Cir. 2007), respectively). In light of Supreme Court authority "'consistently eschew[ing] bright-line rules under the Fourth Amendment, [and] instead emphasizing the fact-specific nature of the reasonableness inquiry,'" the Eighth Circuit joined the Ninth and Tenth Circuits in "declin[ing] to adopt a per se rule that police may never stop an individual to investigate a completed misdemeanor." Id. (quoting Ohio v. Robinette, 519 U.S. 33, 39 (1996)).[33]

This Court similarly should follow the majority approach for at least three reasons. First, as the Eighth Circuit observed, adoption of a blanket ban on Terry stops for completed misdemeanors conflicts with the Supreme Court's view that the Fourth Amendment's reasonableness standard generally does not permit line-drawing of

---

[33] Research confirmed the absence of any ruling by the Fourth Circuit on this question; however, a district court in this Circuit effectively adopted the same stance as the Eighth, Ninth, and Tenth Circuits. See United States v. Jegede, 294 F. Supp. 2d 704, 708 (D. Md. 2003). The majority of state courts to confront this issue also apparently have refused to construe the Fourth Amendment as imposing a per se ban on Terry stops for completed misdemeanors. See Cecilia R. Byrne, Comment, To Stop or Not to Stop: The Application or Misapplication of Hensley to Completed Misdemeanors, 12 U. Pa. J. Const. L. 1191, 1197-1201 & nn.37-60 (2010) (citing and discussing state appellate decisions).

that sort.  See id.  Second the Fourth Circuit has rejected reliance on the felony/misdemeanor distinction in a closely-related Fourth Amendment context.  See Street v. Surdyka, 492 F.2d 368, 372 (4th Cir. 1974) ("We do not think the fourth amendment should now be interpreted to prohibit warrantless arrests for misdemeanors committed outside an officer's presence.  The difference between felonies and misdemeanors is no longer as significant as it was at common law.").  Third, as the Supreme Court has observed, "numerous misdemeanors involve conduct more dangerous than many felonies." Tennessee v. Garner, 471 U.S. 1, 14 (1985).

     After making that determination, the issue for the Court then becomes whether the particular misdemeanor for which reasonable suspicion existed in this case, i.e., driving with a revoked license, raised a governmental interest significant enough to warrant the level of intrusion occasioned by Plaintiff's instant investigatory detention.  See Hughes, 517 F.3d at 1017-18.  In making this assessment, the existence of "potential threats to citizens' safety" represents one of the "important factors" for the Court to consider.  Id. at 1017 (citing Moran, 503 F.3d at 1141, and Grigg, 498 F.3d at 1081).  In this regard, North Carolina has a significant, safety-related interest in aggressive enforcement of its prohibition against operation of motor vehicles by persons with revoked licenses.  See Delaware v. Prouse, 440 U.S. 648, 658-59 (1979) (recognizing that "States have a vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles" and observing that "drivers without licenses are

-31-

presumably the less safe drivers"); <u>State v. Carlisle</u>, 285 N.C. 229, 232, 204 S.E.2d 15, 16 (1974) ("The purpose of the [driver's license] revocation proceeding is . . . to remove from the highway one who is a potential danger to himself and other travelers."); <u>Honeycutt v. Scheidt</u>, 254 N.C. 607, 610, 119 S.E.2d 777, 780 (1961) (holding that "purpose of the suspension or revocation of a driver's license is to protect the public").

In addition, although no court appears to have addressed the propriety of a <u>Terry</u> stop for a completed offense of driving with a revoked license, the reasoning of other decisions supports the view that the Fourth Amendment should be construed to permit such action. For example, the Ninth Circuit identified offenses with "potential for ongoing and repeated danger" as among completed misdemeanors that might warrant a <u>Terry</u> stop and gave "reckless driving" as an example. <u>Grigg</u>, 498 F.3d at 1081. Similarly, a district court in this Circuit cited offense conduct with the "potential for repeated danger, such as . . . dangerous driving," as a circumstance where the Fourth Amendment balance would tilt in favor of a <u>Terry</u> stop for a completed misdemeanor. <u>United States v. Jegede</u>, 294 F. Supp. 2d 704, 708 (D. Md. 2003). Finally, a state supreme court has observed that "[t]o cling to a rule which would prevent a police officer from investigating a reported complaint of reckless driving would thwart a significant public interest in preventing the mortal danger presented by such driving." <u>Floyd v. City of Crystal Springs</u>, 749 So.2d 110, 117 (Miss. 1999)). Driving with a revoked license constitutes a form

of "dangerous driving," Jegede, 294 F. Supp. 2d at 708, with the "potential" to occur "repeated[ly]," Grigg, 498 F.3d at 1081; Jegede, 294 F. Supp. 2d at 708. The Court therefore should not adopt a rule that "would thwart [the] significant public interest in preventing . . . such driving," Floyd, 749 So.2d at 117.

Nor does the particular intrusion upon Plaintiff's liberty interests in this case outweigh the public interest in the investigation of the offense of driving with a revoked license. Plaintiff's testimony reflects that, during the instant Terry stop, he endured no "frisk" and suffered only a momentary detention accomplished by Officer Hugel "plac[ing] his hand on [Plaintiff's] arm and kind of just h[o]ld[ing] [Plaintiff] at bay" (Docket Entry 25-2 at 18). This detention thus falls on the less intrusive end of the spectrum of government intervention permitted during a Terry stop. See, e.g., United States v. Leshuk, 65 F.3d 1105, 1109-10 (4th Cir. 1995) (reiterating that "drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force" all represent forms of law enforcement intervention that can occur under Terry); United States v. Sinclair, 983 F.2d 598, 603 n.* (4th Cir. 1993) (ruling that, if circumstances warrant, Terry stop can exceed 20 minutes).[34]

---

[34] At a minimum, no "clearly established" right to freedom from a Terry stop existed under the circumstances of this case; as a result, Defendant Brafford's invocation of his qualified immunity defense (see Docket Entry 89 at 17-19) entitles him to judgment as a matter of law. See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (holding that government officials "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would

(continued...)

Alternatively, the record establishes as a matter of law that when Officer Hugel restrained Plaintiff, Defendants collectively[35] had probable cause to believe Plaintiff had committed the offense of driving with a revoked license and, therefore, his seizure did not violate the Fourth Amendment. See Devenpeck v. Alford, 543 U.S. 146, 152 (2004) ("[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed."); Street, 492 F.2d at 371 ("There is no [Fourth Amendment] prohibition against arrests for investigations where probable cause exists."). "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt. And this means less than evidence which would justify condemnation or conviction, . . . [but] more than bare suspicion: Probable cause exists where the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." Brinegar v. United States, 338 U.S. 160, 175-76 (1949) (internal citations, parentheses, and quotation marks omitted); see also Los

---

[34](...continued)
have known"); McVey v. Stacy, 157 F.3d 271, 277 (4th Cir. 1998) ("When determining whether a reasonable officer would have been aware of a constitutional right, we do not impose on the official a duty to sort out conflicting decisions or to resolve subtle or open issues.").

[35] "Probable cause . . . can rest upon the collective knowledge of the police, rather than solely on that of the officer who actually makes the arrest." United States v. Pitt, 382 F.2d 322, 324 (4th Cir. 1967).

<u>Angeles Cnty., Cal. v. Rettle</u>, 550 U.S. 609, 616 (2007) (describing "probable cause" as "a standard well short of absolute certainty").

As noted above, the competent evidence in this case reflects that Defendant Brafford "saw a Toyota pickup truck . . . heading south on Second Street [near the county courthouse in Albemarle] . . . [and,] [i]n the short time that [he] could see into the truck as it drove by, [Defendant Brafford] believed that [he] saw [Plaintiff] sitting in the driver's seat operating the vehicle." (Docket Entry 26 at 2 (¶ 13).) Shortly before, Defendant Brafford had received information from "the Stanly County Communications Center that [Plaintiff's] license was suspended." (<u>Id.</u> at 2 (¶ 10).) Defendant Brafford communicated his belief that Plaintiff was driving with a suspended license to Defendant Speights (through Sergeant King). (<u>See id.</u> at 3 (¶ 19); Docket Entry 27 at 12; Docket Entry 28 at 2 (¶¶ 7-8).) Defendant Speights thereafter observed the truck described to him by Defendant Brafford (via Sergeant King) traveling in the direction indicated by Defendant Brafford (via Sergeant King); moreover, when Defendant Speights turned his vehicle around, he saw the truck parked across from the courthouse and Plaintiff crossing the street toward the courthouse. (Docket Entry 28 at 2 (¶¶ 9-12).)[36]

The offense of driving with a revoked license in violation of N.C. Gen. Stat. § 20-28(a) requires proof of "(1) the operation of

---

[36] As previously discussed, <u>see</u> <u>supra</u>, pp. 28-29 n.32, Plaintiff's inadequately supported assertion that Defendant Brafford lied about these matters does not suffice to create a genuine dispute that would preclude entry of judgment as a matter of law in Defendant Brafford's favor.

a motor vehicle by a person (2) on a public highway (3) while his operator's license is suspended or revoked . . . [with (4)] actual or constructive knowledge of the suspension or revocation . . . ." State v. Atwood, 290 N.C. 266, 271, 225 S.E.2d 543, 545 (1976). Defendant Brafford's belief that he saw Plaintiff driving a truck on a public street (as inferentially corroborated by Defendant Speights's sightings of first the truck in motion and then Plaintiff walking away from the parked truck) coupled with Defendant Brafford's knowledge of the recently-reported state of Plaintiff's license provided probable cause of those elements.[37]

For these reasons, the Court should reject Plaintiff's contention that, prior to his formal arrest, Defendant Brafford subjected him to an unlawful seizure at the hands of Defendant Speights and Officer Hugel.[38]

---

[37] Probable cause existed as to the fourth element based on Defendant Brafford's recent receipt of a report of the revoked status of Plaintiff's driver's license because North Carolina law: 1) requires the Division of Motor Vehicles to "immediately notify the licensee in writing" of a suspension, N.C. Gen. Stat. § 20-16(d); 2) permits the giving of such notice by mail to the licensee's "address as shown by the records of the Division," N.C. Gen. Stat. § 20-48(a); and 3) generally recognizes a "presumption of regularity of official acts . . . [including] the mailing of [notices]," Henderson Cnty. v. Osteen, 297 N.C. 113, 117, 254 S.E.2d 160, 163 (1979). Moreover, "[p]robable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction. Rather, the court will evaluate generally the circumstances . . . to decide if the officer had probable cause for his action: In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Adams v. Williams, 407 U.S. 143, 149 (1972) (internal citations, quotation marks, and block quotation styling omitted).

[38] Plaintiff has presented little competent evidence that Defendant Brafford caused the particular detention Plaintiff has described; however, Defendants' brief in support of their renewed summary judgment motion did not
(continued...)

*Unlawful and Retaliatory Arrest*

The Complaint alleges that Defendant Speights "falsely charge[d] [Plaintiff] with driving while his license were [sic] revoked as instructed by [Defendant] Brafford" in violation of Plaintiff's "rights protected by the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution" (Docket Entry 1 at 1-2) and that Defendant Brafford ordered Defendant Speights to "charge [Plaintiff] with fabricated charges in retaliation for [Plaintiff's] filing of civil rights complaints against several county officials of Stanly County in Case No. 1:04-CV-00404 . . . violat[ing] [Plaintiff's] rights protected by the First Amendment of the United States Constitution" (id.). The Court should grant summary judgment to Defendant Brafford on these claims because probable cause existed to support Plaintiff's arrest.

"[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." Devenpeck, 543 U.S. at 152; see also Street, 492 F.2d at 372 ("We do not think the fourth amendment should now be interpreted to prohibit warrantless arrests for misdemeanors committed outside an officer's presence.").[39] Moreover, "[p]robable cause . . . can rest upon the

---

[38](...continued)
press this argument (see Docket Entry 89), perhaps because the record does contain evidence that Defendant Speights said he was "just doing what [he] was told to do" (Docket Entry 25-2 at 6) and that Officer Hugel arrived on the scene in response to Defendant Speights's call for assistance (id. at 5, 17, 18, 23).

[39] As previously noted, see supra, p. 24-25 n.28, the Fourth Amendment's unreasonable seizure provision (as made applicable to the States by the
(continued...)

collective knowledge of the police, rather than solely on that of the officer who actually makes the arrest." <u>United States v. Pitt</u>, 382 F.2d 322, 324 (4th Cir. 1967). For reasons discussed above, <u>see</u> <u>supra</u>, pp. 34-36, even before his formal arrest, Defendants collectively possessed probable cause that Plaintiff had committed the misdemeanor offense of driving with a revoked license. Further, by the time of Plaintiff's formal arrest, the undisputed record reflects that Defendant Speights had acquired additional evidence of said offense in that he had corroborated Defendant Brafford's report regarding the status of Plaintiff's license. (Docket Entry 28 at 2-3 (¶ 14); <u>see also</u> <u>supra</u>, p. 20 n.17.) In addition, Defendant Speights learned that the Division of Motor Vehicles not only had suspended Plaintiff's driver's license, but also had issued a "Pick Up Order" for said license. (<u>Id.</u>) This knowledge established probable cause of two additional misdemeanors, "refus[al] to surrender a driver's license on demand of the Division [of Motor Vehicles]," N.C. Gen. Stat. § 20-29, and "fail[ure] to surrender . . . [a] license" after notice by mail that the Division of Motor Vehicles has asserted its authority to take possession thereof, N.C. Gen. Stat. § 20-45.[40]

_____

[39](...continued)
Fourteenth Amendment), rather than the Due Process Clause of the Fifth and Fourteenth Amendments, applies to claims of this sort.

[40] Because North Carolina law separately provides authority for "[a]ny sworn law enforcement officer with jurisdiction . . . to seize [a] . . . license . . . if the officer has electronic or other notification from the Division that the item has been revoked," N.C. Gen. Stat. § 20-45(c), the noting in the records of the Division of Motor Vehicles of the issuance of a "Pick Up Order," in addition to the fact of a revocation, would support a reasonable inference that
(continued...)

Plaintiff's unlawful arrest claim thus fails as a matter of law and his "First Amendment [retaliatory arrest] claim suffers a similar fate. Plaintiff contends Defendant sought . . . Plaintiff's arrest because Plaintiff [exercised rights protected by the First Amendment]. . . . [W]hen 'law enforcement officers might have a motive to retaliate but there is also a ground to charge criminal conduct against the citizen they dislike the objectives of law enforcement take primacy over the citizen's right to avoid retaliation.'" Elkins v. Broome, 328 F. Supp. 2d 596, 600 (M.D.N.C. 2004) (Bullock, J.) (quoting Keenan v. Tejeda, 290 F.3d 252, 261-62 (5th Cir. 2002)), aff'd, 122 Fed. Appx. 40 (4th Cir. 2005). In other words, "[t]he existence of probable cause for the arrest defeats Plaintiff's First Amendment claim, regardless of Defendant's motivation." Id.; accord Williams v. City of Carl Junction, Mo., 480 F.3d 871, 877 (8th Cir. 2007) ("Because [the

---

[40](...continued)
the licensee not only had a revoked license, but also had failed or had refused to surrender that license after a proper request. It matters not whether Defendant Speights actually drew this inference or even had any awareness of the above-referenced offenses. See Devenpeck, 543 U.S. at 153 ("Our cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause. That is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause. As we have repeatedly explained, the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." (internal citations and quotation marks omitted)). Similarly, neither Plaintiff's denial that he committed the driving while license revoked offense with which Defendant Speights charged him nor the ultimate dismissal of that charge have any bearing on Plaintiff's false arrest claim. See Michigan v. DeFillippo, 443 U.S. 31, 36 (1979) ("The validity of [an] arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest.").

plaintiff] has failed to show that the police and code-enforcement officers lacked probable cause to issue these citations . . . [his] First Amendment retaliation and related conspiracy claims fail." (citing <u>Hartman v. Moore</u>, 547 U.S. 250, 265-66 (2006), and <u>Barnes v. Wright</u>, 449 F.3d 709, 720 (6th Cir. 2006))); <u>Dahl v. Holley</u>, 312 F.3d 1228, 1236 (11th Cir. 2002) ("[The plaintiff] also claims that she was arrested in retaliation for her constitutionally protected speech against the police department's recruitment and use of confidential informants. Whatever the officers' motivation, however, the existence of probable cause to arrest [the plaintiff] defeats her First Amendment claim."); <u>Curley v. Village of Suffern</u>, 268 F.3d 65, 73 (2d Cir. 2001) (dismissing plaintiff's First Amendment retaliatory arrest claim and holding that, "because defendants had probable cause to arrest plaintiff, an inquiry into the underlying motive for the arrest need not be undertaken").[41]

"Evenhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer." <u>Devenpeck</u>, 543 U.S. at 153 (internal brackets, citations, and quotation marks omitted). Because, viewed from an objective perspective, the collective knowledge of Defendants Brafford and Speights provided probable cause to arrest Plaintiff,

---

[41] Apart from the unpublished affirmance of <u>Elkins</u>, research did not reveal any Fourth Circuit decisions addressing the issue of whether the existence of probable cause forecloses a First Amendment retaliatory arrest claim. The United States Courts of Appeals for the Ninth and the Tenth Circuits have rejected that rule. <u>See</u> <u>Howards v. McLaughlin</u>, ___ F.3d ___, ___, 2011 WL 856275, at *12 (10th Cir. 2011); <u>Skoog v. County of Clackamas</u>, 469 F.3d 1221, 1235 (9th Cir. 2006).

the Court should grant Defendant Brafford's renewed summary judgment motion as to Plaintiff's claims for unlawful and retaliatory arrest.

## CONCLUSION

For the foregoing reasons, Defendants are entitled to judgment as a matter of law. In light of this recommendation, Defendants' motion to strike an affidavit filed by Plaintiff and Plaintiff's motion seeking judicial action on this case are moot.

**IT IS THEREFORE RECOMMENDED** that Defendants' Renewed Motion for Summary Judgment (Docket Entry 90) be **GRANTED.**

**IT IS ORDERED** that Defendants' Motion to Strike the Affidavit of Tony Frick (Docket Entry 98) and Plaintiff's General Pleading for Adjudication (Docket Entry 101) are both **DENIED AS MOOT.**

                          /s/ L. Patrick Auld
                          **L. Patrick Auld**
                    **United States Magistrate Judge**
March 22, 2011